Your big audience left. Nobody was here for our case. Feliciano. Good afternoon, Your Honors. My name is Alan Berkowitz. I'm counsel for the appellants Parexel and Barnett International. Your Honors, this case involves a trial below on two claims, a Pennsylvania wrongful discharge claim and also a claim under the Sarbanes- in back pay to the point of on both counts. The jury wasn't, well couldn't really, according to the court's instruction, distinguish between the damages based on the Pennsylvania statute on Pennsylvania and SOX. Isn't that right? I don't believe that that's right, Your Honor. I think that the with that was awarded under both statutes. If you look at the verdict sheet, that's what the verdict sheet said. The compensatory damage component, which was separately charged, was solely based upon the Pennsylvania wrongful discharge claim because the SOX statute does not provide for that and the punitive damage is similarly, Your Honor, wrongful termination. We're only on the Pennsylvania wrongful discharge claim and not under the federal statute. Which raises this question in my mind, Mr. Berkowitz. If the jury awarded damages, all three categories are associated with the wrongful termination claim under Pennsylvania state law, assuming you won and that this was not a SOX violation, as a practical matter, aren't we right where we were? Leaving aside your argument about the- I have exactly the same question. Yeah, leaving aside the argument that the another argument I want to discuss with you, but leaving that aside for a minute, aren't you right in the same spot? Not exactly, Your Honor. Why? You're in the same spot with respect to the back pay, the compensatory and the punitives, but the attorney's fee award. The party stipulated that there were $299,000 of attorney's fees through trial, subject to the SOX claim being under the SOX claim. The Pennsylvania wrongful discharge claim doesn't have with it any attorney's fee provision. So, you're right except for the attorney's fees. All the other damage items would remain the same. It wouldn't matter if the SOX were, if there weren't a SOX violation. Exactly right, Your Honor. I see. Does Pennsylvania permit as a discretionary matter attorney's fees on the wrongful termination? No, Your Honor. There's no fee-shifting element. It's considered just a general tort under Pennsylvania law, and there's no fee shift. Unlike some of the statutes allow for fee shift, like Pennsylvania Human Relations Act has that, but not this general tort that's a court-created tort under Pennsylvania law. Thank you. We're obviously here primarily on the punitive damage issue, given the amount of dollars at stake, and the punitive damages that were awarded were $1.7 million against the $44,000 in back pay and the $50,000 in compensatory damages. Assuming that there should be punitive damages, as I understood you to say, it shouldn't be more than $200,000. Was that my reading the right case? Your Honor, the case law is complex with respect to the guidelines for ratios, and we have a couple of different positions on that. In our initial brief, I think that one of the guideposts on ratio is that if the compensatory damages are considered substantial, a number of courts have said that the ratio should be one-to-one, but of course it's never quite defined mathematically what substantial is and exactly how much is substantial. There was a panel decision issued by this court in June, albeit in a different factual setting, which said that $45,000 in compensatory damages can be considered substantial. Prior to that time, there have been higher numbers that have been talked about. Didn't I write an opinion on punitive EBT? Intermedical case. That's correct, Your Honor. In that case, that case was unusual because the court actually reduced the punitives. The district court reduced it to $500,000 something, and I reduced it to $1,000,000. Further to a million, and I think the compensatories were $50,000,000 in that case, and the punitives were reduced down to $1,000,000, even well below a one-to-one ratio in that particular case, Your Honor. Well, isn't Mr. Brooks, isn't the reprehensibility factor something that's supposed to weigh heavily in our estimation? There is no doubt, Your Honor, that all the cases say that the reprehensibility set of five factors are probably the most important of the three guideposts, although the other two guideposts should be considered. Yeah. Now, recognizing you don't want to speak ill of your client, isn't it kind of a tough posture to stand up and say, after a jury has found that in fact this was retaliatory discharge against somebody who endeavored to do the right thing, papered the record pretty dang well in saying, hey, I'm coming forward. I don't want to lose my job. I'm just telling you, you've got a bad apple here who's doing illegal stuff. And then after taking all those steps, he and several other people get their heads handed to him because they're calling out corporate wrongdoing at high levels. Now, under those circumstances, don't you think that maybe a court ought to say, hmm, pretty dang reprehensible? Well, Your Honor, this area of law has been trying to bring some form of uniformity to approach to what reprehensibility means. Obviously, in all of these cases, punitive damages are only going to be awarded in cases where a jury has found that there was some sort of outrageous behavior. The question then becomes, what is it about this particular case that makes it so that there are five factors that the Supreme Court has set out for analyzing reprehensibility and which this Court has applied several times? And with all due respect, Your Honor, only two of those factors, of the five, were found to be present by the district court. It's not a how many factors did you hit test, is it? Isn't it a how bad does it look? I mean, assume it was only one factor, but it was really, really, really bad. Are you saying, well, it was just one out of five, give them a dollar? Your Honor, I beg to differ, but we would say that the proper approach, and the approach that the Supreme Court has followed, and this Court, is to look at these five factors, each one of which is a distinguishing factor for what differentiates those cases that warrant a more severe penalty than those that don't. Probably the most critical factors are that the courts have repeatedly said that physical injury and Are those torts that ought to be the most, could be most severely punished, and this Court has recognized numerous times, including in the CGB case, which you authored, and Jurinko, that were those two factors not present... Well, Jurinko isn't a precedential opinion. Correct, Your Honor. Well, it's understood that this is not a physical injury case, and we take your argument that a physical injury case represents a particularly egregious set of circumstances. Here, with what we are dealing with, though, tell us why the jury's decision, still within a single-digit ratio, seven to one, why that was misguided in light of what you and I, and everybody in the courtroom who's read the briefs, knows the record is. Your Honor, the, first of all, what I would say is that only two of the five factors are misguided. The ratio was not seven to one. The ratio was either 34 to one or 18 to one, in this case. Depending upon, there's $44,000 in back pay, there's $50,000 in compensatory, that's $94,000 if you add the two together, the pinners were 1.7 million. So it was... I apologize. So it was a much higher ratio, and we believe that that's what... But it was 17. Don't you say it was 17 or something like that? It's either 34 to one, if you use the $50,000 compensatory number and compare that to the 1.7, that's 34 to one. If you use the $94,000, that's 18 to one. Right, and I apologize for the misstatement. And so the precedent that the Supreme Court and this court has established is that those sorts of ratios automatically call into question the viability of the award. And you have a relatively small amount of, on the record, damage award. And I think recognizing that, the district court and the appellees here have tried to come up with different ways to inflate the denominator, but I think that all of those are not validly accepted by this court, or should not be. One of the things they argued was that the $44,000 back pay shouldn't be used. You ought to use the full back pay that the plaintiff sought in the case, which was $315,000. And if you use that number, then you get to a more rational ratio. We think that that's totally inappropriate because the jury rejected the $315,000 based on the evidence before it, because the plaintiff actually did have substantial income during the back pay period. So, Your Honor, to answer your question, we think that the, when you look at the three guideposts, the reprehensibility guidepost, you look at the ratio guidepost, and also when you look at the civil guidepost, in Pennsylvania, there are two relatively similar comparators. One is the Pennsylvania whistleblower statute, which protects public sector employees in Pennsylvania who call out wrongdoing or abuse, and that statute does not offer any punitive damages. It has a $500 penalty associated with it. And also, the Pennsylvania Human Relations Act, another Pennsylvania statute, which protects against discrimination and retaliation for complaining about improper acts that are covered, also does not offer punitive damages. Yeah, but Pennsylvania common law does, right? I mean, I understand you're saying, hey, there's some statutes out there that don't, but there's no question that Pennsylvania common law provides for punitive damages for a wrongful termination, right? There's no doubt about that, Your Honor. But on the other hand, the third guidepost asks the court to look for comparable state civil penalty areas or other enactments to see whether the ratio and the amount of cases appropriate. I just noticed you haven't addressed, and it's probably our fault, your second point that the Sarbanes-Oxley Act must be dismissed. Yes, Your Honor. I could address that briefly. Our main argument there is that the Sarbanes-Oxley Act is very specific in terms of what is protected behavior. This is the distinction between fraud and theft. In a sense, though, in terms of the damages, it doesn't matter in terms of the punitive damages, does it? It does not, Your Honor. The only relevance was that at one point, the appellees argued that you ought to include the attorneys' fees into the denominator for ratio purposes. But nevertheless, it's an important issue. It is an important issue, but doesn't have nearly the dollar effect in this case as the punitive damages do. No. But the Sarbanes-Oxley Act makes it, covers terminating people who reasonably believe that SOX has been violated. And in this case, everybody was talking about SOX. In fact, part of his job was to look for whether they were compliant with SOX, and the same with his immediate boss, Collins, who had that job. So it's hard to say that there was no fraud because it doesn't require fraud in terms of the violation. Well, the violations do require fraud, but Your Honor is certainly correct that it only requires at the point of having an objective and subjective reasonable belief that there was fraud. Mr. Berkowitz, why don't we, your time is up, why don't we listen to Mr. Fortunato and see what he has to say about this. Okay. Thank you, Your Honor. Okay? Thank you. Good afternoon, Your Honors. Michael Fortunato on behalf of Ossie Feliciano of the appellee in this particular case. He got a windfall, didn't he? He did not, Your Honor. Judge Joyner found a 5-to-1 ratio because he found the conduct using your decision, Judge Jordan, in the CGB case to be utterly reprehensible, and that's what he said in his post-trial order. Well, since the compensatories here were $94,000, I'm not a real math whiz and managed to state it wrong earlier, but your opposing counsel corrected me and pointed out that that's an 18-to-1 ratio. How can you, in light of Supreme Court authority that makes it pretty clear that that kind of ratio poses constitutional problems? There's two ways to do that, Your Honor. One is, first, the math is right. Is $1.7 million to $94,000 an 18-to-1 ratio? Of course it is. But the court's going to say it's not just about math. If we're here just to do math, that's too easy. The three guideposts, and this court itself has said, you look at the three guideposts. Let's look at the degree of reprehensibility, number one. And I'm not even asking you to get it out of the single-digit ratios. I'm just asking you to adopt what Judge Joyner did, which was to say, look, this conduct was reprehensible. You don't need to be a rocket scientist to know that this was reprehensible. This was a guy who was responsible for making sure that this company was compliant with a new statute, and he blew the whistle on them. They called him a whistleblower, and they went through tremendous lengths over the next nine months to fire a financially vulnerable individual. But it doesn't affect health or safety. There was no injury, no personal injury. Looking at those factors. That's the only prong that we don't hit of the four prongs under the degree of reprehensibility, Your Honor. Now, this court may – this is an employment case. So the message that the appellants are asking you to send is, in the employment context, fire the good ones because they'll be able to get a job and mitigate their damage. Unlike the State Farm case. Do you really think, Mr. Fortunato, that the world would take from a reduced punitive but still substantial punitive damage award here? Go ahead and fire your people. I mean, this is – I would think, I would hope the folks at PowerXL are, you know, not looking at this as an economically sensible strategy going forward. Well, I would hope, and I would hope that that's – isn't that the message that the State's interest is? Look, this is reprehensible conduct and let's make sure it doesn't happen again. Well, it violates the law. So it violates the law, but that's not – I mean, that's true. I mean, anything that violates the law is reprehensible. The question is what degree of reprehensibility we're talking about. It's sort of a mystical issue. Let's look at the five prongs. The five prongs that this court has laid out is adopted by – or adopted the Supreme Court's view as one. Is it economic harm or is it physical harm? Now, the Fourth Circuit in Nance has included emotional harm as part of physical harm, not just economic harm. Now, you're in a unique position because in this particular circumstance, you're talking about an employment case. This isn't a bad faith insurance case like the Willow tornado case. This isn't bad faith insurance like State Farm versus Campbell. This is in the employment context, number one. And what factor do you – the emotional harm that was suffered by the defendant could be more akin to physical harm than it is to purely economic harm. It's not a decision purely in the economic realm is the phraseology that this court has used. The second – I agree it's not the public health and welfare and the safety of the public. It doesn't involve that second prong. The third prong is financial – did they target someone who they knew was financially vulnerable? Here's a guy who says, I'm blowing the whistle. I bought a new house. I'm newlywed. I got a baby on the way. I don't want to get in trouble. And then on top of that, not only do they fire him nine months later, they put his wife's company out of business by refusing to pay her invoices. All of this is part of the record. That is targeting someone that they knowingly knew – that they knew was financially vulnerable. And then the last prong – I don't think you have to persuade us that they were bad actors. Well, that goes – but then the last prong is was it intentional? Was there malice? Was it reckless? Or was this mere accident? And then – so now we're three of the five prongs on the degree of reprehensibility. And the final one is – Well, and according to Judge Joyner as well, according to the lower court, and I realize your standard is plenary or de novo at this circumstance, but I think we had also won the repeated conduct. Now, this is – and this is borrowing from both – I was going to say the Duranko case, but I'll set that aside. It's not precedential. But from Willow, you looked – and I think in CGB, Your Honor, you as well wrote that, look, okay, if it's just one person and it's repeated within the one person, that may be less persuasive. But here you have the termination of Collins, the termination of – But they settled with Collins. Well – Collins went away. They resolved – in some way they resolved Collins. And the same with Klimaska, Your Honor, but they were both resolved after the jury worked in this case. And they – both of those individuals testified at the trial. So you have hitting at a minimum on three, possibly four, within the degree of reprehensibility, which this court has said is the most important factor. So now let's go to the ratio. All right. Let me, if I can, if it's all right with my colleagues, I just want to make sure I can ask about the SOX aspect of this. I understand you don't want that punitive damages number to move. This case – well, first, let me ask you to speak about Reed v. MCI. That's that Department of Labor arbitration panel decision that you kind of give your back of the hand to in your answering brief. And they come back in their reply brief and say, in effect, that Mr. Feliciano hasn't spoken to the nub of that case, which is the Department of Labor applying this Sarbanes-Oxley whistleblower statute, saying, look, it's not enough for you to say they're making me do something illegal. They're pirating software or, in this case, pirating data. It's not enough for you to say the company could be hurt with fines and other penalties from regulators for doing bad things. There has to be an element of fraud or deception, and one of the listed problems in the statute, in order for a Sarbanes-Oxley whistleblower protection claim to lie. Why are they wrong in saying that that's the message of Reed? Because I think Reed was more of a pleading issue, Your Honor, than anything else. When talking about the stolen software, the ALJ or the administrative review board there said, look, he never alleged any violation of the fraud statutes or any other rule or regulation violation of the SEC, that it was an internal software issue that he didn't bubble up to the surface to meet one of the prongs that are required of the protected activity statute. But here, in this case, we have, and Judge Slover mentioned at the outset, you have a circumstance where did he provide information that he reasonably believed to constitute mail fraud, wire fraud, or security fraud. That's the key I'm trying to get you to focus on, because it is both objectively and subjectively reasonable. It's not enough that he believed that this was fraud. The question also has to be asked, was it objectively reasonable for him to think that this was wire fraud, which is what you've built. I mean, am I correct that that's the only thing you've built this around? You haven't said, well, this is number five on the SOX list, enforcing an SEC regulation. You haven't said, you've said he thought it was wire fraud. That's what we're looking at, right? Well, I think wire fraud and mail fraud, I think what I'm looking at is the lower court said, the lower court's opinion mentioned mail fraud, wire fraud, and fraud on the shareholders. And the court went through, and that's why I think this case differs from Reed, in that factually it's distinguishable for this reason. Feliciano said in the blanket of a Sarbanes-Oxley audit, which wasn't present in Reed, that you've tasked me with the responsibility of looking at the database. I'm telling you that we have a supervisor who's going out into the Internet, hacking into our competitors' websites. When you say in the context of a Sarbanes-Oxley audit, and, in fact, I'm looking at page four of your brief where you say, from a SOX auditing perspective, each record had to be entered into the database with a particular source. And you cite the record there, but you don't cite where, if it were really the case, I guess this poses my question, if it were really the case that what was going on was affecting a Sarbanes-Oxley audit, why was the argument never made, look, fraud or no fraud, the whistleblower statute says right there, the fifth item on the list of things is any problem related to the statute or the regulations associated with Sarbanes-Oxley. So we don't have to show fraud. We just have to show that this was something being done pursuant to Sarbanes-Oxley, either the statute or the regulations. But that argument's never made, and I've looked in vain in your statute to find someplace where, even though you keep saying it's a SOX audit, excuse me, your audit, that shows this was somehow done pursuant to the statute. Can you help me with that? Absolutely, Your Honor. I wish, in hindsight, maybe that would have been the better argument to make in the brief, but the reality is that it's all laid out in the factual portion. Look what was going on, and look what the evidence that was proven in the case was, and there are cites to the record, that Barnett Educational Services fell under the jurisdiction of Ann Carraher and Jim Collins beginning of July 2003. Mr. Collins testified, and it's undisputed, that he was then responsible for certifying for Barnett Educational Services that it was SOX compliant, that he had tasked Mr. Feliciano with the obligation to check the data and validate it. That's where you're putting the rabbit in the hat, and I'm having trouble. When you say SOX compliant, I'm not trying to fight with you. I'm just trying to find out what is it, where is it, where is anything in the statute or the regulations that will tell us that what he was doing, Mr. Feliciano, had something to do with compliance with Sarbanes-Oxley, because that's significant, at least to me. I'd like to know it if it's in there. Okay, it is in there, and it's in the record in Mr. Collins' testimony, and I can't point you to a page as we speak, but the reality is that the purpose, leaving aside the retaliation aspects of Sarbanes-Oxley and the employment protections it offers, its main principle was to make sure publicly traded companies had sufficient controls in place to ensure that they could validate for their shareholders that they were Sarbanes-Oxley compliant, leaving aside the employment ramifications. Which means financial reporting, right? Which means that you are reporting to your shareholders that our end-of-the-day numbers, our net net profits, and what we're saying are profits per shareholder, are legitimate. Exactly. So what does going into the database to check the source of marketing information have to do with being financially compliant? It may be that I've got my answer, which is it's not directly, that there's some inferential leap that you're taking. No, it's not an inferential leap at all, Your Honor. The marketing database was the principal source of how they generated revenue for that particular business, which went up to the parent company, which was publicly then publicly reported. That they were... That's a little like saying, though, that's a little like saying if it were a manufacturing operation, they're using bad resin, and we can show they're using bad resin, and therefore my information about the chemical composition of the resin is really about financial reporting. I mean, the marketing database was producing the income stream, but it wasn't the financial reporting. It was something that was used to generate income, and the SOX concern is about are you accurately reflecting your income? No. So I'm not seeing your link. I don't think it's that black and white, Your Honor. It's are you generating revenue from legitimate sources? I mean, if Verizon came in and stole Comcast's towers, and at the end of the day was putting NCIS on a Verizon television and generating revenue from that, but they were doing it, and the revenues were higher because they were stealing Comcast's signal, then that would not be a legitimate source of revenue for them to be reporting at the end of the day, and that's exactly what happened in this case. So your position is any illegality, any illegality within a company is ultimately a SOX-covered illegality because it can produce a change in bottom line, and that makes it subject to Sarbanes-Oxley? I don't know that I would say it that starkly. The only thing that's on appeal, Your Honor, is whether Mr. Feliciano engaged in protected activity by saying he reasonably believed that the company was engaged in mail fraud, wire fraud, or fraud on the shareholders when he said, look, you're generating revenue from information that your executives are stealing. You're asking me to certify to your shareholders that the source of this information is legitimate. I can't do it, and then he got fired. So this is just a did we sufficiently prove prong one of the prima facie case. Mr. Collins said I can't do it, but did Mr. Feliciano say that? Sure. He went to Mr. Collins and said this is illegitimate. Well, I know what he did, but did he say I'm not going to certify? Well, it wasn't his responsibility to certify. He told Mr. Collins I can't, and Mr. Collins said I cannot certify for the company, which was my responsibility. I'm looking at one of the, you know, his big memo, his September 15, 2003 memo, and I've read it, and I've read it repeatedly, and it talks about theft, and it talks about how being tagged as a theft or a pirater is a death sentence in his profession. It talks about, I mean, he's clear, he's clear, and he's correct, as the facts seem to have played out, that, you know, Ms. Carher was doing bad stuff that was bad for the company, and she deserved to get the ax, and she did, but he never anywhere in here says I'm worried about fraud. He says I'm worried about the theft that's going on. I'm worried about the risk to my reputation if I'm associated with thieving people's data. I'm worried about the abuse of our firewalls, but he never says, and there's fraud out here. There's deception. There's people being fooled. Your red light is on, but please answer that question. Thank you, Your Honor. Absolutely, Your Honor, and if that's not fraud, if ultimately when you're responsible for complying with Sarbanes-Oxley, the publicly traded company, that this task is underneath that umbrella, are we SOX compliant? He says you're stealing information, and you're using that, and I can't validate this information for you. If that's not fraud, if he needs to use the word fraud, you're right. Maybe he didn't use the word fraud, but it's certainly generating revenue from an unlawful practice, which is sufficient, same as wire fraud, same as mail fraud. Well, thank you, Mr. Porciano. Thank you, Your Honor. Mr. Berkowitz, do you have some rebuttal time? How much? I can't hear you. Two minutes. Two minutes? Okay. I'll keep it brief, Your Honor. I guess, Judge Jordan, to pick up with the questions you had asked, that's exactly the point that we've made, is that this case involved the claim of theft. You know, we're not saying we're proud of the theft, but it was theft. There was never any ñ it's not a question of semantics. There was no underlying fraud that anybody had ever pointed to. There was no fraud in obtaining the data. There was no fraud in using the data. The complaint was as Your Honor just cited it. It was the theft issue. But couldn't you reasonably have believed it? I mean, you need a lawyer to know the distinction between fraud and theft. Well, that's what the district court certainly said, but we actually think that there's a common understanding that theft and fraud are different. People understand what it means to be defrauded, and the element of fraud is always some act of deception, and there was never any act of deception here. To convert every theft into a SOX case expands the statute beyond what it is today. But it doesn't say that. The statute says reasonably believed. That's the problem. Let me ask if I could a real practical question, which you may not want to answer here. And this has been bugging me since I started reading this. I do not understand why this case didn't get worked out. Well, I don't want to ask that. I don't understand why people didn't sit down and work this out. Well, we'll come off the record for that. This is a case that is just puzzling. Well, I'm going to ask that. We're on the record. Yeah. Okay. Thank you. Your time is up. Okay, thank you. Would you take us off? Close the mics. Okay, come on off, both of you. Thank you.